1) Criminal Complaint (Rev. by USAO on 3/12/20)     ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT
APR - 1 2020
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

United States of America

v.

EDUARDO MORENO,

Defendant(s)

Case No.

2 0 MJ 01480

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of March 31, 2020 in the county of Los Angeles in the Central District of California, the defendant(s) violated:



| Code Section | Offense Description |
| --- | --- |
| 18 U.S.C. § 1992(a)(1) | Terrorist Attacks and other Violence against Railroad Carriers and Mass Transportation Systems |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*Complainant's signature*

Douglas Swain, Special Agent FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: 4/1/2020

_____
*Judge's signature*

City and state: Los Angeles, California

Hon. Alexander F. MacKinnon, U.S. Magistrate Judge
*Printed name and title*

## **AFFIDAVIT**

I, Douglas Swain, being duly sworn, declare and state as follows:

### I.   **INTRODUCTION**

1.   I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since 2005.   I currently serve as the FBI's maritime liaison at the Ports of Los Angeles and Long Beach, where I specialize in counterterrorism and the investigation of other crimes that impact the nation's critical maritime infrastructure including the intermodal cargo system.

2.   During my employment with the FBI and as the FBI's maritime liaison at the Ports of Los Angeles and Long Beach, I have become familiar with the Port's facilities, the types of freight vessels that dock at the port, and the ways in which the trains that operate at the Port are loaded and unloaded before their cargo is transported into the United States or onto freighters destined for other ports around the world.   As an FBI agent, I am also familiar with the strategy, tactics, methods, tradecraft, and techniques that criminals, terrorists, and their agents employ at critical infrastructure locations such as the Ports of Los Angeles and Long Beach.   I have likewise become familiar with a variety of investigative techniques and resources, including, surveillance, confidential sources, search warrants, evidence seizures, and telephone toll analysis.   I have received both formal and informal training from the FBI regarding criminal and counterterrorism investigations.   I have

also attended training concerning the use of electronic
communications, cell phones, and computers in furtherance of
crime.

## II.  **PURPOSE OF AFFIDAVIT**

8.   This affidavit is made in support of a criminal
complaint against EDUARDO MORENO ("MORENO") for a violation of
18 U.S.C. § 1992(a)(1): Terrorist Attacks and other Violence
against Railroad Carriers and Mass Transportation Systems,
commonly known as Train Wrecking.

9.   The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested complaint and
warrant and does not purport to set forth all of my knowledge of
or investigation into this matter.  Unless specifically
indicated otherwise, all conversations and statements described
in this affidavit are related in substance and in part only and
all dates and time are approximate.

## III.  **SUMMARY OF PROBABLE CAUSE**

5.   As detailed below, on March 31, 2020, MORENO, an
engineer and operator of locomotives and trains for a rail
company (referenced herein as "Rail Company 1"), drove a
locomotive (the "train") at high speed, did not slow down near
the end of the train track, and knowingly and without lawful
authority and permission derailed the train off the train tracks
near the U.S.N.S. Mercy, a Navy hospital ship then docked in the

Port of Los Angeles.  In two post-arrest interviews, MORENO
waived his Miranda rights and admitted that he intentionally ran
the train off the track, and stated that he wanted to bring
attention to the government's activities regarding COVID-19, and
was suspicious of the U.S.N.S. Mercy.

### IV.   STATEMENT OF PROBABLE CAUSE

**A.   MORENO Derails a Train at the Port of Los Angeles Near
the U.S.N.S. Mercy**

6.    Based on my conversation with California Highway
Patrol Motorcycle Officer Dillon Eckerfield, I know the
following:

a.    On March 31, 2020, at approximately 1:00 p.m.,
while on patrol Northbound on Harbor Boulevard in San Pedro,
California, Officer Eckerfield noticed the train speeding
towards the end of a nearby train track.  Officer Eckerfield
noticed the train because it did not slow down as it neared the
end of the track.  Officer Eckerfield saw the train smash into a
concrete barrier at the end of the track, smash into a steel
barrier, smash into a chain-link fence, slide through a parking
lot, slide across another lot filled with gravel, and smash into
a second chain-link fence.

b.    After observing the train derail off the tracks
and crash into various barriers and fences, Officer Eckerfield
made a U-turn and rode his motorcycle towards the train.
Officer Eckerfield saw three to four individuals who excitedly
pointed to the North East direction near the West Basin
Terminal.  When Officer Eckerfield looked towards that

direction, he observed an individual wearing a bright yellow
fluorescent-colored safety vest come forward from the cab of the
train, jump off the train, and run.

      c.   When Officer Eckerfield entered the main entrance
of the West Basin Container Terminal, he observed the same
individual, wearing a bright yellow fluorescent-colored safety
vest and a backpack walking in his direction.  Officer
Eckerfield dismounted his motorcycle, drew his weapon, and
ordered the individual to the ground.  The individual was later
identified as MORENO via a California Driver's License that was
in his possession.

      d.   While Officer Eckerfield detained MORENO, without
provocation MORENO made a series of spontaneous statements such
as: "You only get this chance once.  The whole world is
watching.  I had to.  People don't know what's going on here.
Now they will.  At night, they turn off the lights and don't let
anyone in.  I'm going to expose this to the world.  When was the
last time you went to Dodgers' stadium?  We might not be able to
go again."

      e.   The Los Angeles Port Police ("LAPP") arrived
shortly after and took over the case.

    7.  Based on my review of reports and observations of
responding officers and other personnel, as well as from open-
source media reporting, I know that, as a result of MORENO's
actions, the crashed train leaked a substantial amount of fuel
oil requiring clean up by fire and other hazardous materials
personnel.  Based on my walk-through of the incident location,

I also know that the crashed train came to rest approximately 195 meters from berth 93, where the U.S.N.S. Mercy was docked an additional 50 meters away.

**B.    In Two Recorded Confessions, MORENO Admits to Derailing the Train**

8.    Based on my review of LAPP reports and my conversations with LAPP detectives, when LAPP Officers arrived, they immediately read MORENO his <u>Miranda</u> rights.  MORENO waived his <u>Miranda</u> rights.  LAPP Officers detained MORENO and placed MORENO in a LAPP patrol vehicle.

1.    MORENO's Confession to LA Port Police Detectives

9.    Based on my review of LAPP reports and my conversation with Sgt. Clements, LAPP Detective Yamamoto and Sgt. Clements shortly arrived and re-read MORENO his <u>Miranda</u> rights.  MORENO acknowledged that he knew his rights, waived his rights, and stated that he wanted to speak to the detectives.  This interview was audio-recorded.

10.    Based on my review of LAPP's reports and my conversation with Sgt. Clements, I know that MORENO said the following:

a.    MORENO said he "did it" because people need to know what was going on with the Coronavirus ("COVID-19") pandemic and the U.S.N.S. Mercy.  MORENO stated that he was not sick, but he had been watching and "putting all the pieces together."  MORENO stated that "they are segregating us and it needs to be put in the open."  MORENO is suspicious of the

U.S.N.S. Mercy and believes it had an alternate purpose related to the COVID-19 or a government takeover.

      b.   MORENO stated that he has been an employee of Rail Company 1 for many years and worked as an engineer.  MORENO stated that he was responsible for moving train cars using a locomotive.  MORENO stated that when he came to work, referring to March 31st, everything was normal.  While MORENO was "pushing" the last train car of the day, he started thinking about "everything" and "just kept going and going."  MORENO stated: "I don't know.  Sometimes you just get a little snap and man, it was fricking exciting . . . I just had it and I was committed.  I just went for it, I had one chance."

      c.   MORENO admitted intentionally derailing and crashing the train and doing so because he knew it would bring media attention and "people could see for themselves," referring to the U.S.N.S. Mercy.

      d.   MORENO denied that this was a preplanned event. MORENO stated that no one else was involved.

   11.  Based on my review of LAPP's reports and my conversation with Sgt. Clements, Sgt. Clements then asked MORENO for consent to search his backpack, vehicle, work locker, cellphone, and residence.  MORENO agreed and consented to the search of his property.  MORENO stated that he had nothing to hide and he was not working with anyone else and that "no one was pushing his buttons" to make him do this.

2.   MORENO's Confession to FBI Agents

12.   After MORENO spoke to LAPP Detective Yamamoto and Sgt.
Clements, FBI Task Force Officer Candice Wright and I
interviewed MORENO at approximately 6:50 p.m.   I read MORENO his
Miranda rights, MORENO waived his Miranda rights and agreed to
speak to us.   This interview was audio and video recorded.

13.   Again, as noted above, all conversations and
statements described below are related in substance and in part
only.   During the interview:

a.   MORENO admitted to intentionally driving the
train off the tracks.   MORENO stated that he did it out of the
desire to "wake people up."   MORENO stated that he thought that
the U.S.N.S. Mercy was suspicious and did not believe "the ship
is what they say it's for."   MORENO stated that he was trying to
draw the world's attention to the U.S.N.S. Mercy.

b.   MORENO also stated that, "I jumped the train off
the tracks.   I can't wait to see the video . . . I took the
train off the end, I tried to get attention."

**C.   LAPP Detectives Interview Rail Company 1 Employees**

14.   Based on my review of LAPP's reports and my
conversation with Sgt. Clements, LAPP detectives and Sgt.
Clements went to a local Rail Company 1 office.   LAPP detectives
spoke to the Senior Manager of Operations, G.P.   Based on my
review of LAPP's reports and my conversation with Sgt. Clements,
I know the following:

a.   G.P. stated that he pulled video of the incident. G.P. did not release the video to LAPP detectives but he played the recorded video for Sgt. Clements.  In the videos, Sgt. Clements saw the following:

i.   The first video showed a forward-facing view of the train's front window, which is the point of view of the train operator.  The video clearly depicted the train traveling at a high rate of speed and crashing directly through a barricade at the end of the train track.  The train then traveled across a street and came to a rest after going through a fence.  The collision occurred within close proximity of three vehicles occupied by drivers.

ii.   The second video depicted the interior of the train compartment where the engineer sat.  This video depicted MORENO operating the train then spontaneously lighting a road flare inside of the train.  MORENO then put the train in full speed and held his hand toward the camera with his middle finger raised.  MORENO then held the flare outside of a window through impact.  Based on Sgt. Clements' review of the second video, it did not appear that MORENO attempted to pull back the throttles or engage the braking system.

15.  Based on my review of LAPP's reports and my conversation with Sgt. Clements, I am aware that Sgt. Clements asked G.P. why MORENO would light a flare inside the train and whether it was an emergency signal.  G.P. stated that under no circumstance would an employee be allowed to light a flare

inside the train.   G.P. believed the flare would ignite the fuel after a collision.

### D.   MORENO's Conduct was Against and Affected a Railroad Carrier in Interstate and Foreign Commerce

16.   Based on my experience as the FBI's maritime liaison at the Ports of Los Angeles and Long Beach, my review of Rail Company 1's publicly available business website, and my conversations with U.S. Customs and Border Patrol agents, other law enforcement officers, and employees of the Port of Los Angeles who were present on the day that MORENO derailed the train, I know the following:

a.   Rail Company 1 provides rail transportation, maintenance and dispatching services to the Ports of Long Beach and Los Angeles, which together form the largest container port in the United States.  In addition to switching over 40,000 units of carload freight annually, Rail Company 1 provides rail switching services for nine on-dock intermodal terminals and provides dispatching services for about 140 intermodal or unit trains per day.  Rail Company 1 connects with two other railroad carriers: Rail Company 2 and Rail Company 3.

b.   Rail Company 1's trains at the Port of Los Angeles – and, in particular, its trains at on-dock intermodal terminals such as the one operated by MORENO – are used to load and unload cargo between the United States and the rest of the world.

c.   For example, Rail Company 1 trains connect cargo that is offloaded from foreign-flagged ships docked at the Port

of Los Angeles to trains that transport that foreign cargo to
various cities across the United States.   These trains
ultimately connect at junctions in areas of the Central District
of California such as Redondo Beach, San Bernardino, Union
Station in Downtown Los Angeles, Mojave, and Barstow.   Railroad
tracks at these junctions, in turn, connect to other areas of
the United States such as Arizona, Texas, the Pacific Northwest,
Chicago, and Las Vegas.

      d.   The Rail Company 1 train that MORENO derailed
carried a container of cargo ultimately destined for Vietnam.

### V.   CONCLUSION

17.   For all of the reasons described above, there is
probable cause that EDUARDO MORENO has committed a violation of
18 U.S.C. § 1992(a)(1): Train Wrecking.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this ___1st___ day of
___April___, 2020.

_____
UNITED STATES MAGISTRATE JUDGE
MICHAEL R. WILNER